Good morning, Your Honors, and may it please the Court, Anthony Nguyen on behalf of Appellant Tamar Kasbarian. Given my limited time, I just want to focus on the issue of causation, specifically causal connection, which seems to be the issue that the District Court had and, of course, reserve any time for rebuttal, maybe about three minutes, and if Your Honors have any questions. As to the issue of the causal connection, I think it's important to first take a look at the position that both the District Court and the defense focused on, and that was specifically with the issue of Scott Rosen being the individual who initiated the first investigation as a result of the member complaint. I will submit to the Court that even with that fact, it doesn't change anything as far as the retaliatory causation in this case, and here's why. That's because prior to that member complaint being made, which was around December of 2014, as early as January of 2014, Ms. Kasbarian had raised the very same concerns to several individuals, including to Jack Gannon. So why is that relevant? That's relevant because when the member complaint was finally made, and when the initial investigation with the Excel spreadsheet was conducted, revealing that these concerns are substantiated, at least for two employees, well, that spreadsheet was given to several individuals, including to Mr. Gannon. Now Mr. Gannon is put in a situation where, well, these concerns were actually raised by Ms. Kasbarian previously, and nothing was done about it. So what happens? Well, besides those individuals that Ms. Kasbarian had complained about either being terminated or having resigned as a result of this, Mr. Gannon specifically targeted and requested that Mr. Berger, who was the loss prevention individual who was conducting the interviews, specifically requested that Ms. Kasbarian be interviewed about these issues. So what's the big deal about that? Why does that even show causation? The reason why that shows causation is because, first of all, there's a contradiction between what Mr. Gannon purports to have happened with that directive, in which he denies that he did that, versus what Mr. Berger testified as to, in saying that it was Mr. Gannon who directed him to do that. Okay, well, now we have an inconsistency, again, what's the big deal? The big deal here is that the testimony also revealed that there was an agreement that these employees who would be interviewed would be suspended after the interview. And the reason why there potentially is pretext now, and an issue of causation that would at least allow a trier of fact to find that, is because the evidence shows, and this was specifically through Mr. Gannon's declaration, that he prepared a final paycheck for Ms. Barrett before the interview occurred. So why prepare a final paycheck before the interview occurred, when there is supposedly an agreement that these employees would be suspended after the interview, if not for the fact that, well, he really did want to retaliate against her, he wanted to get rid of her, because she was the individual who raised these concerns in the first place. She's the only one for whom a paycheck was prepared? That, I don't, there is no evidence in the record to suggest that anyone else had a final paycheck prepared for. But to answer the question directly, Your Honor, I don't know if she was the only one who had the final paycheck. In what way do we give to the notion that, okay, assume there was prima facie causation, you've said was evidence of pretext that he prepared that check, but they didn't terminate her, and they transferred the whole staff, except the new guy, and so what's the evidence that they singled her out for retaliation? Well, the pretext and the evidence that they singled her out is this. Regarding that new membership advisor, MA, as everyone's been kind of abbreviating it, that new MA was still technically present when these fraudulent activities were occurring. So this excuse whether or not this MA was relatively new and wasn't part of this, you know, meeting at the West L.A. location, I think at least is disputed enough for a trier fact to make the determination, okay, well, maybe it didn't make any sense for this MA, this new MA, to specifically be held at the West L.A. location. And I also think that we're not, I think the issue here is regarding the other MA and Ms. Kasparian who were suspended, it's sort of an apples and oranges comparison. In other words, they're not similarly situated because the evidence shows that the other MA who was suspended, the allegations of fraud were actually substantiated for that other MA, but they were not for Ms. Kasparian. So despite that, Ms. Kasparian is still targeted to be transferred. And she wasn't fired because, and this is important, because the investigation itself revealed that they could not substantiate the allegations against her. So of course Mr. Gannon could not fire her despite having a final paycheck prepared, despite the prior agreement that these employees would only be suspended, because the evidence could not be substantiated that she actually did engage in this fraud. So I would submit, Your Honor, that that disputed issue, that area, will at least allow a trier fact to make the decision that, okay, well, this is something that's suspect, it does seem like they targeted her. She wasn't similarly situated to the other employees. And there was a other MA who got the benefit, despite being present during the time of this fraudulent conduct. And I- There were only two transferred then? Yes, Your Honor. There was the other MA in which the allegations were substantiated, and Ms. Kasparian, whereas the other MA stayed at the Wessel label. And the other guy who your customer complained about was fired. Correct, Your Honor. And I think this all comes to the head with the standard that the defense has applied, as well as the district court has applied regarding the issue of causation of retaliation. And that standard is a but-for standard. And the case that the defense and the court relies on, the Reeves case, is actually a FEHA case. It's not an 1102.5 case. And that's significant for a couple of reasons. First, even if this was a FEHA case, newer cases including Harris v. City of Santa Monica, and specifically Alamo v. Practice Management Information Corp., which provides citation 219 Cal at 466 at 478. And that's a 2013 case. Found that the issue is, on the issue of retaliation is, it's a substantial motivating factor that is a determination of causation. Not a but-for factor. There's legislation, too, that was passed after Reeves. Correct, Your Honor. That says the activity prescribed was a contributing factor. And you beat me to my next point. It's a labor code. Yes, Your Honor, absolutely. And that's my next point, because we're not even dealing with a FEHA case here. We're specifically dealing with an 1102.5 claim and a public policy claim based off of that. In which case, as Your Honor pointed out, it's a contributing factor that's the causation standard. And that's also codified in 1102.6 of the labor code, which is the affirmative defense for 1102.5. So here, not only did the district court apply the wrong standard, but the defense argued the wrong standard as it relates to causation for the retaliation 1102.5 claim. Taking that all as a whole, based on the contradictory testimony with Mr. Gannon and Mr. Berger, as well as the inconsistency in application as to her being transferred. A trier of fact could definitely find that this is a situation in which retaliation was at play. And we would submit, Your Honor, that again, this is an issue of summary judgment and adjudication. And the disputed facts are certainly something that are supposed to be construed against the moving party, in which this instance with the trial court, it was not. I think I have some time left, and I'll reserve the rest. Let me ask you a question. Yes, Your Honor. In reading the briefs and the factual recitations, I'm thinking to myself, there are going to be a claim for constructive discharge here. But at your blue brief on page 26, I think you say, you never made a claim of constructive discharge, and you're not pursuing a claim of constructive discharge? It's, I think, an issue of regarding nomenclature or semantics, because we did allege in our complaint several times construct determination and being forced to resign. I think council's position on that is that, well, there isn't a specific claim for constructive determination. The issue of constructive determination isn't that it's a claim, it's a theory of an adverse employment action, in which there are many here, including the demotion, or as the council calls, the transfer. But the adverse employment action is just a form, I'm sorry, the constructive determination is just a form of the adverse employment action that is part of the 1102.5 in public policy. So you are pursuing, okay. Then, tell me what's the best evidence of extreme or outrageous conduct by the defendant that would get over just a merely insulting language? What's the extreme conduct here, the outrageous conduct? For the intentional infliction? Yes. I would submit that, just based on what we submitted on the papers on that issue, I think that the conduct that can be construed as outrageous is the fact that she specifically complained about illegality that she thought would be addressed, and that that, in turn, was turned around and used against her by the company to then subject her to an adverse employment action. That would be the evidence, Your Honor. It wouldn't be anything in terms of extreme or outrageous comments. Although there were comments, but we would submit that the comments are more to the issue of animus and retaliatory intent than something that would be construed as outrageous. And I look forward to- Can I reserve? Yes, Your Honor. Thank you. Thank you. Good morning. May it please the court. My name is Sherry Suica. I'm here on behalf of Equinox Holdings, Incorporated. And I also wanted to focus on causation, and more particularly, actually, the pretext issue. Regardless of what standard applies, whether it's a contributing factor or a but-for cause, which there are different standards depending on which claims we're talking about in this record. But regardless of that, Ms. Kasbarian has laid out the legitimate business reasons for personnel decisions here. And as Your Honor pointed out, there's no evidence that Ms. Kasbarian was singled out in any way. She complains in January of 2014, she's the only employee that complains about purported illegal activity. This investigation took place a year later. She was blown up and denigrated by Gannon and others for what later proved to be a legitimate complaint. Well, if you look at what Mr. Gannon said, Mr. Gannon was the decision maker here. And what he said was, Ms. Kasbarian testified that she heard second or third hand that he called her crazy. Maybe not nice, especially in a person of his position with the company, but it doesn't evince a retaliatory motive. It's not connected in any way to her activities. The other thing he called her was Amy Winehouse. And while the district court turned it into an issue of a play on whether that means she's a whiner, Ms. Kasbarian herself testified that she understood it to mean a derogatory term because Ms. Winehouse, she died from a drug overdose and she was a drug addict. How that relates to any of the issues in this case, I don't know. Mr. Gannon, on the other hand, he testified, he admitted he said that because she had hair similar to Ms. Winehouse, they had the same kind of hairstyle. But no one testified it had anything to do with whining. That was something the district court said. After she made that first complaint, wasn't she confronted by a number of the people that said, she's a tattletale, she was warned that she might ruin her ability to make a lot of money. That her complaints were too aggressive and that she should leave if she didn't want to see such practices. That she should only worry about those things that she can control. Or Mr. Gannon apparently, at least from her perception, ignored her. Isn't that all set things up for what actually happened then a year later? No, because you have to look at the context. Who said what? Who allegedly said what? So the decision maker is Jack Gannon. He's the one who made the decisions, who to terminate, who to suspend, who to transfer. And he says two things, according to the record, crazy and Amy Winehouse. Kira Simonson is the person who's talked about tattletaling. Kira Simonson was Ms. Kasbarian's immediate supervisor, but she was interviewed in the context of the investigation. She was on the same side of that investigation as Ms. Kasbarian. She was not on the other side. Consistent with what Judge Malone just said. They were trying to protect their scam. Whose scam? The ones that were going on as Kasbarian was blowing the whistle on. Well, see, it's contradictory positions here that Ms. Kasbarian is trying to take. Now, so what you're saying, so what that would mean is that Ms. Simonson is trying to protect the scam, and Mr. Gannon is trying to protect the scam. But Mr. Gannon, they say, is the one who instigated the investigation. I'm sorry. So why- Well, maybe I misunderstood you. But you said that she was part of the investigation in the same way Kasbarian was part of the investigation. She was a target. Well, my point there is that she can't be a person who's engaging in retaliation. She's not the one who participated with Mr. Gannon in the decisions to terminate or demote him. No, but she was the one that was party to the scam. Well, we don't know that. She said something about, well- We don't really know that. She said tattletale. That's all we know. I didn't get your point. I didn't get your point. Sure. Okay. So, then going back to Judge Maloney, your question. So, Mr. Berger is the one who actually conducts the second part of the investigation with the interviews and ultimately makes the recommendations of what he found. He didn't know Ms. Kasbarian, didn't know she complained. This was the first time he ever interacted with her. Tracy Kuva is the person who did the first part of the investigation with Mr. Stanfa. And they're the ones who conducted the audit that found anomalies in the billing practices. And neither one of them are alleged to have said anything inappropriate in any way. And critically, Ms. Kasbarian doesn't challenge their findings. She doesn't say, oh, yeah, their findings are incorrect. That's not disputed. They made these findings. Those aren't challenged. Mr. Berger conducted interviews based on those findings. And then when you look at who's involved here, there were four membership advisors when the whole thing started in December. The first one, who was the one who actually did the conduct that the member was complaining about, terminated right away. So, then you're down to three by the time that Mr. Berger is interviewing everyone. One of them is the new guy, who wasn't at all implicated in any of the audit findings, Ms. Kasbarian, and then one other. The Ms. Kasbarian was transferred because Mr. Berger concluded that there wasn't, not that she was innocent, but there wasn't enough proof that she was guilty of anything. She was transferred. The other one, the other MA, who was also suspended, he was fired. Now, there was a reference here that he was also transferred. He was fired. And that... So, she was the only one transferred then? Right. She was. She was transferred where the others were fired. Yeah, I know, but it's one thing to say, yeah, she was transferred. It was a lateral position, except we were paying her $19 an hour. Now, we're going to pay her $9 an hour. And maybe she'll quit. I see what you're saying. I'm not trying to argue that, you know, she viewed that as a demotion. And at the summary judgment stage, we don't challenge that opinion of hers. But what is telling is that you have to look at... So, Mr. Gannon supposedly has a retaliatory motive. He's the one that's making all these decisions. Her complaints were a year ago. A year ago, she made these complaints. And when it comes time to deciding what to do with what the investigators found, he doesn't take the opportunity to fire her like the other two. Two other people were fired. He could have easily fired her if he had a retaliatory motive. Instead, he transferred her. He didn't find the evidence. There was no evidence that she was part of the scam. That's not true. There was evidence, just not enough to warrant termination in these individual's views. So... How does that fit with your argument? They were suspicious of her and didn't want her around. But they didn't have enough to fire her, so they figured, okay, let's send her down to San Diego and pay her less than half of what she's been paid. Well, they didn't send her to San Diego. They sent her to Marina Del Rey, which is also a very nice club. And not far from where she was already working in West L.A. And Mr. Gannon wasn't getting rid of her by transferring her. He's in charge of the whole West Coast. So if he had this retaliatory animus towards Ms. Kasbarian for making a complaint 12 months beforehand, that's an odd way of showing your retaliatory motive by transferring the person to another club and not getting rid of the person. She's still there. He's still working with her. Why shouldn't you make those arguments to a jury? Because they might believe you and find in your favor. Well, because I don't think I should have to do that. The summary judgment standard is to prevent needless trials. And what a reasonable fact finder has to show here, or what a reasonable fact finder would need to find, is that either the entire investigation was concocted and was just a mechanism to get rid of Ms. Kasbarian, because she's the only one who complained. None of her peers did. Or the investigation was legitimate, but Mr. Gannon is going to use it as a way to transfer her to a club that he still oversees. And I just don't see how a reasonable fact finder could call that retaliation for saying someone's credit card was used a year ago. That was her complaint. And why would Mr. Gannon care about that to harbor retaliatory animus? It just doesn't make sense. Good jury argument. Well, I think it's a good summary judgment argument. And so did Judge Fitzgerald. I can think of a reason. Counsel told them, well, you want to be careful, so put her down to Mar Vista, and maybe she'll do something you can fire her for. Why not just fire her with the other people, then? Didn't have enough information. I don't know. Ma'am, counsel, I think whenever we're dealing with a summary judgment situation, and arguments come back, well, why would they do this? That does sound like a jury question. Doesn't mean I don't necessarily agree with there should be summary judgment in this case. But give us, other than saying, well, why would she do that? Why would she do that? Which is a quintessential jury question. Direct us back to why summary judgment should be appropriate in this case. Well, where's the causal connection? That's, I think, a better argument for you. You don't have timing. It was a year beforehand that she engaged in the only thing that could arguably be considered protected activity, a year beforehand. Then there's a member complaint. So the investigation is started independently, independent of Ms. Casbarian or anything she does. Two people who aren't alleged to have done anything against Ms. Casbarian conduct an audit, have these findings showing anomalies in, not just her sales, but two other people's sales. One is immediately fired. Then they bring in another person who has no contact with Ms. Casbarian, didn't even know her before this investigation, flies out from New York to do these interviews. Interviews five people and decides, okay, here's what's happened here. And then they make some personnel decisions. And Ms. Casbarian, the only person who is not, who didn't receive anything, was someone who was new. And that person wasn't suspended or transferred or terminated because he was new. Everyone else involved was moved out of the club. And the legitimate business reason that was offered was that they wanted to start new with the sales team there. And he was already new. No one else was new. They were all either terminated or moved out. Is that argument based on drawing all of the inferences in favor of the defendant and against the plaintiff's claim? Because aren't we supposed to look at the facts and interpret them most favorably or draw the inferences that favor her when it comes to summary judgment? Right, and so when you look at it through that lens, the facts most favorable to Ms. Casbarian, she complains about something in January 2014. Mr. Gannon is really upset by this, that she would make this complaint. Nothing happens for a year. Someone else complains independently. There's an investigation, and she's implicated in some fashion, not the same as everyone else. And so he's been sitting on this for a year and uses this as an excuse to retaliate against her. It's far-fetched. That's the most reasonable inference. But her implication had nothing to do with charges on credit cards, right? It had to do with nine separate instances where there were sales made without, eight of them without credit card charges, and they canceled within two days, and one of them was on a check that bounced. But that has nothing to do with the complaint about other people using credit cards in an unauthorized fashion. Well, her complaint, it's not even clear what her complaint, well, what she says her complaint was, is that the person in the office next door to her, she overheard that she was telling the person, here, you pay for a month, and then your friend gets a gift card. And she doesn't know, and she made an assumption that this person is being sold a year membership and not knowing that it's a year membership, thinking that they're buying a month membership. But when she was asked, do you know if the person was charged for more than a month, she says, I don't know. So, I mean, I'm not even sure that that's protected activity. We don't raise that at this stage, but it's thin at best. All right, thank you very much, counsel. Thank you. Just to address the issue regarding the timing of the complaint, I think that's sort of a red herring argument here because although she did begin her complaints in early 2014, as I indicated earlier, it did not come to a head until a member separately complained to Mr. Rosen, in which now the issue becomes implicated on Mr. Gannon, who was the recipient of these complaints before and failed to take any action as a result. And the issue whether or not Mr. Gannon, well, it was asked why would he have a retaliatory motive. That is his retaliatory motive. He was aware of these complaints before, he didn't do anything about it, and then once the investigation indicated that, well, this actually was happening at a club that he was in charge of, he had to take action. And unfortunately for my client, he took retaliatory action. And to address the issue of pretext that counsel have raised, there is substantial evidence of pretext here that will allow a trier fact to find that this adverse employment action, whether we're talking about the termination, or the transfer, or demotion, however you want to call it, is something that was motivated by retaliation. She was obviously a well-performing employee. I don't think that's disputed whatsoever. You have the inconsistencies that I discussed earlier regarding the investigation, the application of who should be transferred or suspended, and who isn't. You have the issue regarding the fact that, well, there were several individuals interviewed, the assistant general manager, Simonson, and the three MAs who we've talked about. Well, there's no evidence that the others, whether the assistant general manager or Simonson, who are also responsible for this team, were in any way suspended or fresh start, that is the defendant's position to justify Ms. Kasparian's transfer, who appears to be the sole transfer in this type of situation. Couple that, Your Honor, with the issue regarding the comments. Now, counsel did go over a few of the comments, but the record will show that there were several additional comments that were made in relation to Ms. Kasparian complaining. And the issue with that, Your Honor, and even if the comments were, whether or not they were made by Mr. Gannon or Mr. Hemminginger or Ms. Simonson, I will refer to the court to the case that actually counsel, that the defense cited to, and that's Reed v. Google. And they cite to the Reed v. Google case to address this issue regarding stray remarks. Reed v. Google specifically addressed the issue of stray remarks, and the California Supreme Court there rejected that doctrine and specifically stated that comments made, whether or not by decision makers or non-decision makers, whether or not in the context of a termination decision or not in a termination decision, are all relevant and render summary judgment inappropriate, making this an issue for a trier of fact to determine the weight of the comments that are being made. That's exactly what we have here, Your Honor, and I submit again that the evidence here, at least on a summary judgment standard, renders this case inappropriate for summary judgment. Thank you very much, counsel. Thank you both for your argument. This matter is submitted and this panel is adjourned. Thank you.
judges: Fisher, Owens, Molloy